
FILED
2018 Jan-09  PM 12:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JOHN A. SHARP, JR., and<br>TAMMIE SHARP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.: |
| | ) | **JURY TRIAL DEMANDED** |
| 3M COMPANY, DYNEON, L.L.C. | ) | |
| and fictitious defendants A, B, and C, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

## COMPLAINT
_____

## STATEMENT OF THE CASE

1.      Plaintiffs, John A. Sharp, Jr. and Tammie Sharp, bring this suit against Defendants 3M Company ("3M") and Dyneon, L.L.C. (Dyneon)(collectively, Defendants) for negligence, strict liability, trespass, nuisance, wanton and reckless conduct and citizen suit claims for violation of the Resource Conservation and Recovery Act ("RCRA") arising from the Defendants' contamination of the Plaintiffs' property.  The Defendants knowingly allowed hazardous chemicals including, but not limited to, Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA)(collectively "PFCs"), to be illegally and wrongfully dumped onto Plaintiffs' property and Defendants have knowingly allowed these contaminates to remain on Plaintiffs' property.

2.      The Plaintiffs seek damages from the Defendants for proximately causing

the contamination and the ensuing physical damage and stigma caused to their properties. In addition, the Plaintiffs seek damages for the Defendants' failure to remediate and/or remove PFC contamination from their property.  The Plaintiffs also seek compensation for damage to their surface property rights, the permanent nature of the injury to their properties, emotional distress and mental anguish as well as the loss of quiet and peaceful enjoyment of their land and property.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, which grants jurisdiction over matters in controversy that exceed $75,000 and with complete diversity of parties.

4.     This Court also has jurisdiction over this action in accordance with  42 U.S.C. §6792(a), which confers jurisdiction to federal district courts without regard to amount in controversy or citizenship of the parties for citizen suits arising under the RCRA.

5.     As required by 42 U.S.C. § 6972(b)(1)(A) and (2)(A), , the plaintiffs sent the defendants notice of intent to sue for the RCRA violations and imminent and substantial endangerment set forth herein.  More than 90 days have elapsed since notice was effectuated on the defendants.  Furthermore, plaintiffs served the notice of intent to sue more than 90 days ago upon Phillip Davis, Chief of ADEM Land Division, Scott Pruitt, Administrator of the U.S. Environmental Protection Agency, and Trey Glenn Regional Administrator for the U.S. EPA, Region 4.

6.      Jurisdiction is proper in the instant case, as neither the State nor the EPA has commenced or is diligently prosecuting a civil action in court of the United States or in a state court to require compliance with the RCRA, nor has either of these entities taken any of the administrative actions in RCRA § 7002(b)(2)(B) and (C), 42 U.S.C. §6972(b)(2)(B) and (C).

7.      Venue is proper pursuant to 28 U.S.C. § 1391(e) in that a substantial part of the events or omissions giving rise to the claim occurred in the Northeastern Division of the Northern District of Alabama,   because the property that is the subject of this action is situated in the Northeastern Division of the Northern District of Alabama, and under 42 U.S.C. § 6972(a), because the violations of RCRA occurred in the Northeastern Division of the Northern District of Alabama.

## **PARTIES**

8.      Plaintiff John A. Sharp, Jr. is an adult citizen of Alabama, residing at 2803 County Road 358, Trinity, Alabama.   In addition to his residence, Mr. Sharp owns approximately 20 acres of land at this same location.

9.      Plaintiff Tammie Sharp is an adult citizen of Alabama, also residing at 2803 County Road 358, Trinity, Alabama.   Mrs. Sharp co-owns the 20 acres of land and principal residence with her husband, Plaintiff John A. Sharp, Jr.

10.      Defendant 3M Company ("3M") is a foreign corporation qualified to do business in the State of Alabama, and was doing business in Morgan County, Alabama, at

all relevant times. 3M is a Delaware corporation with its principal place of business located at 3M Center Building, 220-10E-10, St. Paul, Minnesota 55144-1000.

11. Defendant Dyneon, L.L.C. ("Dyneon"), is a wholly owned subsidiary of Defendant 3M, a foreign corporation, licensed to do business in Alabama and doing business in Morgan County at all times relevant hereto. Dyneon, LLC was a single member Delaware limited liability company owned 100% by 3M with its principal place of business also located at 3M Center Building, 220-10E-10, St. Paul, Minnesota 55144-1000. Dyneon, LLC has ceased operations and assigned its assets to 3M.

## FACTUAL ALLEGATIONS

12. The Sharps purchased their home and property located at 2803 Co. Rd. 358, Trinity, Alabama in February of 2006. At the time of purchase, the Sharps had no knowledge that defendants had been engaged in the illegal dumping of PFC contaminated materials on the property nor that Defendants had allowed known PFC contaminated materials to remain on the property. The Sharps own approximately 20 acres of property and the area where the Defendants' illegal open dump site is located is on the opposite end of their property from their residence. The Defendants' illegal open dump is located at the bottom of a steep wooded ravine and was not otherwise visible to the Sharps.

13. In 2016, the Sharps were approached by representatives of the Tennessee Valley Authority ("TVA") seeking to negotiate an easement across portions of the Sharp property to facilitate installation of new high voltage power lines. In June of 2016, the Sharps entered into an easement agreement with TVA to facilitate clear cutting of timber

4

for a right of way across a portion of the Sharp property to allow for the power line installation.

14.     In 2017, while the clear cutting was in process, the Sharps were informed by a TVA representative and/or one of the TVA contractors that the TVA had encountered what appeared to be an old landfill or dump site on the Sharp property.   This was the first notice that the Sharps had that a dump site or landfill site was located on their property. TVA and/or its contractors also advised ADEM, and ADEM has confirmed that the dump site constitutes an illegal and unpermitted open dump site.

15.     In October of 2017, the Sharps were contacted by TVA and informed that the TVA intended to abandon the prior easement area across the Sharp property due to the contamination found in the dump site.   TVA asked the Sharps to agree to amend the prior easement to allow the power line right of way to be relocated.   Otherwise, TVA informed the Sharps that they would file a condemnation action against the Sharps so that the high voltage power lines could be relocated, ultimately in much closer proximity to the Sharp residence.

16.     As part of the previous easement agreement, the high voltage power lines would not have been visible from the Sharp residence and would be located at a distance of more than 400 feet to the west of the residence and down a steep wooded ravine.   Due to the location of the Defendants' contaminated open dump, TVA now intends to condemn another portion of the Sharp property in order to reroute their high voltage power lines so that the lines will now be within 200 feet to the east of the front of the Sharps' residence.

The Sharps' driveway will travel under these High voltage power lines, and the Sharps will be required to drive under these power lines each and every day in order to access their residence.   The lines will be visible at all times from the front of their home and the trees near their home will be clear cut to facilitate the right of way for the power lines.

17.     Contents of the illegal open dump prove that materials and chemicals from the defendants' facility have been illegally dumped on the Sharp property.   Containers providing identifying markings as well as other materials now visible in the uncovered portion of the dump site confirm the Defendants' responsibility for contributing to the dump and causing PFC contamination.   Sampling of materials and surface water in May of 2017 has confirmed the presence of both PFOA and PFOS in extremely high concentrations, more than 100 times those concentrations the EPA deems safe.

18.     Two of the major U.S. manufacturers and users of PFOA, PFOS, and related chemicals are Defendants 3M and Dyneon.   Defendants manufactured and/or used these chemicals at their facilities in Decatur, Alabama and wrongfully disposed of wastes containing these chemicals on their own property as well as on other properties, such as the Sharp property.   The Defendants' chemicals have not only contaminated these lands, but have migrated and continue to migrate into surface waters, groundwaters and ultimately the Tennessee River (Wheeler Reservoir) and its various tributaries.

19.     3M is the present owner of a manufacturing facility located at 1400 State Docks Road in Decatur, Alabama.   3M manufactured and/or used PFOA and PFOS and other chemicals at its manufacturing facility.   From time to time, 3M disposed of solid and

6

hazardous waste, including waste water treatment plant sludge containing PFOA, PFOS and related chemicals, at off-site landfills, including the City of Decatur – Morgan County Landfill, which is currently operating as the Morgan County Landfill, the Morris Farms Landfill, which is currently owned and operated by BFI Waste Systems of America, LLC, and the Burt Jeffries Landfill, sometimes referred to as the Browns Ferry Road Site, now owned by 3M.   The same PFC contaminates are present on the Sharp property.

20.     Defendant Dyneon's fluoroelastomer facility is located on the southern portion of the 3M Decatur facility. Dyneon's fluoroelastomer operations in Decatur previously had been part of 3M's manufacturing processes at the Decatur facility. The manufacturing process wastewater from Dyneon's operations has been and continues to be discharged to 3M's wastewater treatment system, which has discharged and continues to discharge PFOA and PFOS and related chemicals to Baker Creek and the Tennessee River. In addition, Dyneon has discharged wastewater containing PFOA, PFOS, and related chemicals to the Decatur Utilities Dry Creek WWTP, which in turn discharges wastewater containing PFOA, PFOS, and related chemicals into the Tennessee River.   These same contaminates are present on the Sharp property.

21.     The Sharp property is located approximately five (5) miles from the 3M plant and Defendants' facilities.   Based on the markings of containers found in the illegal dump on the Sharp property and other constituents in the waste materials found in the illegal dump, 3M was the generator of, and either disposed of or arranged for the disposal of, wastes containing PFOA and PFOS on the Sharp property.

22.     The stable carbon-fluorine bonds that make PFOA and PFOS such pervasive industrial and consumer products also result in their persistence. There is no known environmental breakdown mechanism for these chemicals. They are readily absorbed into biota and have a tendency to accumulate with repeated exposure. PFOS crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

23.     When humans ingest PFOA and PFOS, these toxic chemicals bind to plasma proteins in the blood and readily are absorbed and distributed throughout the body.  The liver and kidneys are important binding and processing sites for PFOA and PFOS, resulting in physiologic changes to these and other organs.  Because of strong carbon-fluorine bonds, PFOA and PFOS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body.  These toxic chemicals accumulate in the body over time and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs.

24.     The human diseases caused by exposure to PFOA, PFOS, and related chemicals include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The association between exposure to these chemicals and certain cancers has been reported by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking PFOA, PFOS, and related chemicals to diseases based on health research carried out by the Science Panel in the Mid-Ohio Valley population exposed to PFOA, PFOS and related chemicals as a result of releases from an E. I. du Pont

de Nemours and Company chemical plant. The C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population exposed to PFOA in drinking water. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer and also suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma.  Rodent studies also support the link with cancer.  The majority of a United States Environmental Protection Agency ("EPA") Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

25.     Additionally, the C8 Science Panel has found a probable link between exposure to PFOA, PFOS, and related compounds, and the following human diseases: pregnancy-induced hypertension, ulcerative colitis, and high cholesterol. Furthermore, in recent years, immunotoxicity of PFOA, PFOS, and related compounds, has been demonstrated in a wide variety of species and models, including humans. For instance, a study of ninety-nine Norwegian children at age three found that maternal serum PFOA concentrations were associated with decreased vaccine responses, especially toward rubella vaccine, and increased frequencies of common cold and gastroenteritis. The combined human and experimental evidence is in strong support of adverse effects on immune functions at relatively low exposure levels.

26.     On May 19, 2016, due to the evolution of the science surrounding the health effects associated with the consumption of PFOA and PFOS in drinking water, the United

States Environmental Protection Agency ("EPA") published final lifetime Drinking Water Health Advisories for PFOA and PFOS ("May 2016 EPA Health Advisories" or "Health Advisories"). The Health Advisory for PFOA is 0.07 micrograms per liter ("µg/L"), or 0.07 parts per billion ("ppb").   The Health Advisory for PFOS is also 0.07 µg/L, or 0.07 ppb.

27.    The May 2016 EPA Health Advisories are based on the best available peer reviewed studies of the effects of PFOA and PFOS on laboratory animals and were also informed by epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects.

28.    The May 2016 EPA Health Advisories state that PFOA and PFOS have "extremely high" persistence in the environment and the human body, and that the developing fetus and newborn are "particularly sensitive" to PFOA and PFOS induced toxicity.  The May 2016 EPA Health Advisories also state that single exposure to a developmental toxin at a critical time can produce an adverse effect, and that short-term exposure to these chemicals can result in a body burden that persists for years and can increase with additional exposures.

29.    The May 2016 EPA Health Advisories state that, because PFOA and PFOS have similar adverse effects, including effects on the liver, neonatal development, responses to immune challenges, and association with tumors, when these two chemicals

co-occur in a drinking water source, the combined concentrations should be compared with the Health Advisories of 0.07 µg/L or 0.07 ppb in order to offer the necessary margin of protection to all Americans with these chemicals in their drinking water.

30.    The solid and hazardous waste disposed by or on behalf of 3M on the Sharp property contains high levels of PFOA and PFOS and has contaminated surface water on the property and, most likely, groundwater and neighboring streams and waterways. Samples taken from a limited area of the Defendants' open dump in May of 2017 show waste concentrations as high as 11,000 ug/kg PFOS and 890 ug/kg PFOA and a white flakey material dumped by the Defendants and exposed to the elements.   Surface water runoff from the Defendants' open dump site has been found to contain as high as 8.9 ug/L PFOS and 4.4 ug/L PFOA, over 100 times the EPA drinking water health advisory level.

31.    The Defendants have long been aware of the persistence and toxicity of PFOA, PFOS, and related chemicals. Yet, the Defendants knowingly and intentionally dumped, discharged and continue to allow the discharge of these chemicals into the Plaintiffs' property and the environment.

32.    Defendant 3M has known for at least 35 years that PFOA, PFOS, and related chemicals persist in the environment and accumulate in the bodies of humans, fish, and test animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals."

A 1979 3M study of fish caught by the Wheeler Dam (26 miles downstream from the 3M plant) showed that the chemicals bioaccumulate in fish.

33.     Defendant 3M has known for at least 35 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1979 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all of the monkeys, at all dosage levels, died as a result of exposure to the fluorochemicals. It was not until 21 years later, in March 2000, that 3M told the public that a "new study" of the effects of these compounds on Rhesus monkeys is part of the reason 3M pulled one of its consumer products, Scotchgard, off the market. In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

34.     Defendant 3M has known for at least 30 years that its disposal of PFOA and PFOS and related chemicals on its own property was unsafe. For instance, a Materials Safety Data Sheet produced by Defendant 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped into the ground.

35.     In 2002 the United States Environmental Protection Agency ("EPA") took regulatory action under the Toxic Substances Control Act to limit future manufacture of PFOA, PFOS, and related chemicals, based on the persistence and toxicity of these chemicals.

36.     EPA and the Alabama Department of Environmental Management ("ADEM") have identified Defendants' facilities as past and continuing sources of PFOA and PFOS contamination in the Tennessee River and to areas in and around Decatur, Alabama. The primary source of the PFC contamination is the 3M facility, where high levels of PFOA and PFOS in groundwater continue to discharge into the Tennessee River, in addition to ongoing discharges of contaminated wastewater.

37.     As the direct and proximate result of the Defendant's acts and omissions, the Plaintiffs have experienced property damage, land-value diminution, loss of enjoyment and use of their property, emotional distress and mental anguish and continuous nuisance from the Defendants' PFC contamination and refusal to remediate or clean-up the Defendants' contamination.

## CLAIMS

## COUNT ONE - NEGLIGENCE

38.     Paragraphs 1 through 37 of this Complaint are hereby re-alleged and incorporated by reference herein.

39.     At all times relevant hereto, Defendants owed a duty to properly contain and/or dispose of PFC contaminated materials to prevent the release of PFCs onto the Plaintiffs' properties and into the environment.

40.     Defendants breached the duty of care by disposing of PFC contaminated materials in such a manner as to negligently cause, permit, and/or allow the continued and ongoing release of PFCs and other harmful contaminants onto the Plaintiffs' properties and

the environment.

41.     Defendants breached the duty of care by failing to take adequate, reasonable, or sufficient measures to prevent any release of PFCs onto Plaintiffs' properties and into the environment.

42.     Defendants failed to exercise due care in order to prevent PFC discharge onto and into the Plaintiffs' properties and the environment and Defendants have failed to exercise due care in removing or remediating Defendants' PFC contamination.

44.     Defendants knew or should have known that its construction, operation, and inadequate maintenance of waste disposal facilities and/or landfills would ultimately result in a failure or a release, causing the massive and ongoing discharge of PFCs on the Plaintiffs' properties and into the environment.

45.     Defendants' negligent acts and/or omissions as described above proximately caused and continue to proximately cause damage to the Plaintiffs in the form of real and personal property damage, economic loss, out of pocket expenses, loss of quality of life, aggravation and inconvenience, emotional distress and mental anguish, and the creation of conditions that are harmful to human health and the environment, all for which Defendants are liable in damages. To compound the problem, the Defendants' refusal to clean up effort forces the Plaintiffs' to bear the burden of the remaining clean up expenses.

## COUNT TWO - WANTON AND WILFUL CONDUCT

46.     Paragraphs 1 through 45 of this Complaint are hereby realleged and incorporated by reference herein.

47.    Defendants' acts and/or omissions in the construction, operation, contribution to and/or landfilling of the dump area, constituted a reckless or conscious disregard for the rights or safety of the Plaintiffs' well being and property.

48.    Defendants were aware that under the circumstances, actual and substantial harm would arise from the aforementioned acts and/or omissions.

49.    These acts and/or omissions of Defendants are intentional, willful, wanton, reckless, illegal, or were done with conscious and deliberate disregard for the property, safety, and rights of the Plaintiffs.

## COUNT THREE - TRESPASS

50.    Paragraphs 1 through 49 of this Complaint are hereby re-alleged and incorporated by reference herein.

51.    The Defendants' intentional acts and/or omissions have caused and continue to cause PFC contamination to enter the Plaintiffs' properties over their loudly voiced objections.   This knowing and deliberate invasion of the Plaintiffs' properties rights with insult and contumely constitutes a trespass under Alabama law.

52.    Defendants' unconsented to invasion and trespass has caused and continues to cause damage to Plaintiffs in the form of substantial real and personal property damages, out of pocket expenses, loss of quality of life, aggravation and inconvenience, emotional distress and mental anguish, and the creation of conditions that are harmful to human health and the environment, all of which the Defendants are liable for in damages.

## COUNT FOUR - NUISANCE

53.     Paragraphs 1 through 52 of this Complaint are hereby re-alleged and incorporated by reference herein.

54.     Defendants' acts and/or omissions in the construction, operation, landfilling, and contribution to the dump have created a private nuisance, which infringes on the rights of the Plaintiff every day that the nuisance is allowed to continue.

55.     Defendants' acts and/or omissions giving rise to this claim of private nuisance have caused and continue to cause a substantial and unreasonable interference with Plaintiffs' use and enjoyment of their properties, because the Defendants' acts and/or omissions have prevented the Plaintiffs from utilizing and enjoying their properties in the manner in which they intend.

56.     Defendants' unreasonable interference with the Plaintiffs' use and enjoyment of their properties has caused and will cause damage to the Plaintiffs in the form of real and personal property damage, out of pocket expenses, loss of quality of life, aggravation and inconvenience, emotional distress and mental anguish, and the creation of conditions that are harmful to human health and the environment, for which Defendants are liable in damages.

## COUNT FIVE - STRICT LIABILITY

57.     Paragraphs 1 through 56 of this Complaint are hereby re-alleged and incorporated by reference herein.

58.     Defendants have engaged in an ultra-hazardous and abnormally dangerous

activity by discharging and/or allowing the discharge of PFC contamination onto the Plaintiffs' properties, near people, surface and groundwaters, streams and/or wildlife.

59.    Defendants are strictly liable for all damages resulting from its acts, including but not limited to real and personal property damages, economic and recreational loss, out of pocket expenses, loss of quality of life, emotional distress and mental anguish, aggravation and inconvenience, and the creation of conditions that are harmful to human health and the environment.

## COUNT SIX – VIOLATION OF RESOURCE CONSERVATION AND RECOVERY ACT'S PROHIBITION OF OPEN DUMPING

60.    Paragraphs 1 through 59 of this Complaint are hereby re-alleged and incorporated by reference herein.

61.    Section 1004(14) of RCRA, 42 U.S.C. § 6903(14), defines the term "open dump" as:

> …any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under § 6944 of this title and which is not a facility for disposal of hazardous waste.

62.    Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), prohibits the operation of an open dump for land disposal of solid waste.

63.    Defendants have violated and are violating 42 U.S.C. § 6945 by maintaining an "open dump" for land disposal of solid waste, as that term is defined in 42 U.S.C. § 6903(14), on the Sharp property. Wastes remain in the Sharp landfill and the environmental effects of such wastes remain remediable.

17

64.     The 3M dump site on the Sharp property constitutes an open dump, pursuant to 40 C.F.R. § 257.3-3, because it is discharging pollutants into surface waters in violation of the requirements of the National Pollutant Discharge Elimination System ("NPDES") of the Clean Water Act.  Specifically, the open dump has discharged and is discharging surface water contaminated with PFOA and PFOS into unnamed tributaries to Fox Creek without an NPDES permit authorizing those discharges.

65.     The 3M dump site on the Sharp property also constitutes an open dump, pursuant to 40 C.F.R. § 257.3-4, because it is likely leachate from the waste has contaminated an underground drinking water source beyond the solid waste boundary with PFOA, PFOS and other types of chemicals.

66.     The term "open dump" is defined by EPA in 40 C.F.R. part 257 to include any facility which causes a discharge of pollutants into Waters of the United States in violation of the requirements of the National Pollution Discharge Elimination System under § 402 of the Clean Water Act, 33 U.S.C. § 1342. See 40 C.R.F. part 257.

67.     Violations of the open dumping provisions can be addressed in a federal citizen suit pursuant to 42 U.S.C. § 6972(a)(1)(A), as provided in 42 U.S.C. § 6945(a).

**COUNT SEVEN—RCRA IMMINENT AND SUBSTANTIAL ENDANGERMENT**

68.     Paragraphs 1 through 67 of this Complaint are hereby re-alleged and incorporated by reference herein.

69.     Section 7002 of the RCRA, 42 U.S.C. § 6972(a)(1)(B) authorizes any person to bring suit "against any person . . . who has contributed or who is contributing to the past

or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

70.     The defendants qualify as "persons" under 42 U.S.C. 6903(15) that have engaged in the "handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" and are therefore subject to the citizen suit provisions set forth in Section 7002 of the RCRA, 42 U.S.C. § 6972.

71.     PFCs qualify as both solid waste and hazardous waste for the purposes of applying RCRA, because Defendants disposed of the PFCs and associated constituent matter by releasing the chemicals into the environment, and substances on the plaintiffs' land "pose a substantial present or potential hazard to human health or the environment . . ." 40 C.F.R. § 261.2; 42 U.S.C. § 6903(5)( B).

72.     Defendants' release of PFCs and other solid and hazardous waste on Plaintiffs' property may present an imminent and substantial threat to health and the environment because of the ongoing nature and severity of the pollution.

73.     In light of the numerous, severe, and ongoing RCRA violations, the plaintiffs are entitled to a court order requiring the defendants "take such action . . . as may be necessary" to abate the pollution made basis of this claim; plaintiffs' are also entitled injunctive relief, future environmental monitoring, civil penalties, litigation costs including expert witness fees, as well as all reasonable attorney fees.   42 U.S.C. § 6972(a),(e); 42 U.S.C. § 6928(a), (g).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a. Award Plaintiffs compensatory damages in an amount greater than Seventy Five Thousand Dollars ($75,000.00) sufficient to compensate the Plaintiffs for all real and personal property damage, economic loss, out of pocket expenses, loss of use of property, loss of quality of life, emotional distress and mental anguish, and aggravation and inconvenience;

b. An award to Plaintiffs in an amount sufficient to compensate them for the emotional distress caused by Defendants' wanton conduct and trespass with insult and contumely;

c. An award to Plaintiffs in exemplary or punitive damages in an amount sufficient to punish Defendants for their gross negligence, wanton and willful conduct and to deter future gross conduct;

d. An order directing Defendants to completely remediate all PFC contamination, all associated contamination, and all surface damage on the Plaintiffs' properties, and from lands, sediments, and waters surrounding the Plaintiffs' properties;

e. An award of Plaintiffs' post-judgment interest, costs, and reasonable attorneys' fees and litigation expenses, pursuant to 42 U.S.C. § 6972(e), as applicable; and

f. Order such other and further relief as the Court may deem just and proper.

## **A JURY TRIAL IS REQUESTED AS TO ALL ISSUES SO**

## **TRIABLE TO A JURY IN THIS CASE**

Dated: January 9, 2018.

                                       */s/   Jeff Friedman*

Jeff Friedman, Ala. Bar No. asb-6868-n77j
Lee Patterson, Ala. Bar No. asb-5482-e47p
Friedman, Dazzio, Zulanas & Bowling, Pc
3800 Corporate Woods Drive
Birmingham, Alabama 35242
T: 205-278-7000
F: 205-278-7001
jfriedman@friedman-lawyers.com
lpatterson@friedman-lawyers.com

Thompas P. Melton
Attorney at Law, LLC
The Kress Building
301 Nineteenth Street North, Suite 516
Birmingham, Alabama 35203
T: 205-458-4556
F: 205-458-4557
tmelton@tmeltonlaw.com

Carl Allen Cole, III, Ala. Bar No. asb-1309-r75c
The Cole Law Firm, LLC
P.O. Box 2064
Decatur, Alabama 35602-2064
T: 256-353-0550
F: 256-353-0552
carl@carlcolelaw.com

Gary A. Davis, NC Bar No. 25976
(admission requested Pro Hac Vice)
James S. Whitlock, NC Bar No. 34304
(admission requested Pro Hac Vice)
DAVIS & WHITLOCK, P.C.
21 Battery Park Ave., Suite 206
Asheville, NC 28801
T: (828) 622-0044
F: (828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

21

**<u>PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AT:</u>**

3M Company
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109

Dyneon, L.L.C.
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109